Filed 7/31/13  In re Katherine P. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re KATHERINE P. et al., Persons Coming Under the Juvenile Court Law. | B246309 (Los Angeles County Super. Ct. No. CK95755) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE P., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark A. Borenstein, Judge.  Affirmed.

David A. Hamilton, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel and Stephen D. Watson, Associate County Counsel for Plaintiff and Respondent.

# I. INTRODUCTION

The father, Jose P., appeals from the juvenile court's December 5, 2012 visitation order. The order denied the father's visitation request until he underwent a psychiatric evaluation. Further, in order to secure visitation, the father was required to comply with the evaluator's recommendations. The father argues it was error to impose such limitations on his visitation with his two children. We disagree and affirm the visitation order.

# II. BACKGROUND

## A. Section 300 Petition And Detention

On October 1, 2012, the Los Angeles County Department of Children and Family Services (the department) filed a Welfare and Institutions Code[1] section 300 petition on behalf of 13-year-old Katherine P. and 11-year-old year old Anthony P. The petition alleged three counts under section 300 subdivisions (b) and (c). The petition alleged the father placed the children in danger by recklessly driving with them in the car on July 1, 2012. The petition also alleged the father emotionally abused the children by constantly speaking negatively about and verbally assaulting the mother, N. H., and the two youngsters. The children allegedly suffered trauma and post-traumatic stress disorder because of the father's ongoing emotional abuse.

The October 1, 2012 detention report stated there was a long history of domestic violence between the parents. The mother reported the domestic violence ended in 2006 when she and the children moved to a shelter. The mother and children lived in a domestic violence shelter for about three years. The mother and an adult daughter, Evelyn A., secured a restraining order against the father because of his past abuse.

---

[1] Future statutory references are to the Welfare and Institutions Code.

The mother reported Anthony developed post-traumatic stress disorder after witnessing domestic violence between the parents. Anthony often bit his nails, softly hit his head on a wall or defecated on himself when anxious. The child has suffered from encopresis since the age of seven and continued to defecate on himself when he is anxious. He had been seen by many medical professionals and his encopresis was not caused by a medical condition. The mother believed Anthony's problems were due to the domestic violence and the father's current abuse. A September 2, 2009 letter from a Venice Family Clinic therapist, Beth Rosenblatt, indicated Anthony suffered from post-traumatic stress disorder and encopresis due to past trauma. According to Ms. Rosenblatt, "[Anthony] regresses very easily to toddler-like behavior when emotionally triggered and has not yet developed the ability to verbalize rather than regress." Katherine was diagnosed with dysthymic disorder and post-traumatic stress disorder.

The mother stated the father was diagnosed with schizophrenia in 2009 but he was not taking any medication. Katherine said the father has been behaving oddly since November 2011. The father told her that airplanes were taking pictures of him. He also told Katherine that people were following him. Anthony stated the father was paranoid and talked about helicopters landing on the roof of the home. According to Anthony, the helicopters landed while the father was asleep. For years, the father told the children that airplanes were searching for him.

In addition, the mother reported the father had a history of drug use. She suspected the father was still using drugs because he would text or call her during random hours of the night. Katherine indicated the father had a drug history. She stated sometimes the father's face turned pink and his eyes became red and small. But Katherine has not seen narcotics in his possession or seen him use drugs.

The department interviewed the family about the July 1, 2012 driving incident. The mother indicated on that day, the father felt rejected by Katherine. This was even though Katherine had invited him to her middle school culmination ceremony. After the ceremony, the children visited with the father. The parents exchanged the children every Sunday at the West Los Angeles police station. The father had five hour visits with the

3

children every Sunday. On that day, the father was upset with the children so he became verbally aggressive and drove erratically. He refused to slow down or let the children out the car so the mother could pick them up. The mother observed the father appeared frustrated by the children when he dropped them off at the police station. Katherine said she did not want to see the father anymore. Anthony appeared anxious and frozen in shock.

Katherine stated the father was speeding on the freeway on July 1, 2012 because he was mad. According to Katherine, the father slams doors, drives fast, screams and speaks negatively about the mother to the children when he is upset. Katherine stated she did not get along with the father and had a weird relationship with him.

On July 1, 2012, Katherine asked to end the visit early and the father started yelling at her and Anthony. In addition to speeding, the father cut some cars off the road and ran a few red lights. Katherine told the father to slow down but he did not listen. The father refused to leave the children at the paternal grandmother's house and insisted on driving them to the police station. Once the father dropped off the children, he yelled at the mother.

Katherine stated she did not want to visit the father. Katherine said she continued to go to visits because Anthony wanted to visit the father and she did not want her brother to go alone. After the incident, she ignored the father's phone calls, refusing to talk to him. Katherine indicated she was anxious when visiting with the father and felt relaxed now that she had not visited him in several weeks. The mother said the father has not visited the children since the incident because his driver's license was suspended due to unpaid parking tickets.

Anthony stated the father was driving between 80 to 85 miles per hour on July 1, 2012, when the children were returned to the police station. The father also was yelling at the children, talking negatively about the mother and intimidating the youngsters by hitting the steering wheel while driving. Anthony stated the father often drove fast. The incident was not the first time the father drove fast when he was mad. Sometimes,

4

Anthony liked visiting the father. After the July 1, 2012 incident, Anthony no longer wanted to visit the father.

The father denied driving fast or erratic on July 1, 2012. He stated he was driving 55 miles per hour. The father also denied any substance abuse, domestic violence or mental health problems. According to the father, all the allegations were false and he has been wrongly accused. The father claimed he was in the process of suing the department because of the false allegations. The father blamed the false accusations for limiting his visitations with the children. The father also asserted the false accusation caused Anthony's encopresis. Social worker Jennifer Hernandez was unable to obtain any information about the July 1, 2012 incident because of the father's irrational thoughts and uncooperative behavior.

On September 13, 2012, the mother called Ms. Hernandez reporting that the father had tried to take Anthony out of school. The school staff did not release Anthony to the father. This was because the father was not on the emergency contact list. The children had not visited the father since the incident because they did not want to see him.

Ms. Hernandez called the father on September 13, 2012 and he agreed to see her on September 14, 2012. (However, the next day he did not come to the office to meet Ms. Hernandez.) During his conversation with Ms. Hernandez, the father "rant[ed] about the FBI, Facebook, law enforcement corruption" and the lawsuit against the department. He stated his life was in danger and someone was out to get him because of the false allegations about him. He talked over Ms. Hernandez and eventually hung up on her when he became upset.

On September 23, 2012, the mother informed Ms. Hernandez that the father continued to leave inappropriate messages. The father stated the Peruvian embassy was getting involved so he could have custody and visits with the children. The father sent a text message in Spanish to Katherine that was meant for the mother. The message states: "Give me the opportunity to demonstrate how much I care fighting to protect us. I'm not scared of even death. The champion already won." The mother reported the father was extremely upset because the children did not visit him as scheduled by the family court.

5

The mother explained her car was not working and the children did not want to visit the father.

The father did not appear at the October 1, 2012 detention hearing. At the hearing, a temporary restraining order was issued against the father to protect the mother and children. The juvenile court detained the children from the father and released them to the mother. The father was granted monitored visits at the department's office. The department had discretion to liberalize the visits but had to confer with the children prior to liberalization of visits.

### B. Restraining Order And Arraignment Hearing

On November 15, 2012, the father made his first appearance in the case at the hearing on the permanent restraining order and asked for a continuance. The father was granted a continuance and arraigned on the section 300 petition. The juvenile court offered to appoint counsel for the father but he declined, stating: "No, I will get a private lawyer. I just want a continuance." The juvenile court notified the father he needed to obtain a lawyer before the December 5, 2012 adjudication and permanent restraining order hearing. The father was instructed to have his lawyer contact the other lawyers about the case. The juvenile court also informed the father that the temporary restraining order remained in effect. In addition, the juvenile court told the father he was entitled to have monitored visits with the children once he contacted the social worker.

### C. Jurisdiction/Disposition Report

The December 5, 2012 jurisdiction/disposition report summarized the department's interview with the family and attached several documents including a 2009 child custody evaluation. The mother stated she met the father in Peru during her first marriage. The father was her first husband's chauffeur. The mother's first husband died of a brain tumor. The father courted her after her first husband's death. The father

moved to Los Angeles and the mother later joined him. The mother brought Carlos A., her son from her first marriage, to Los Angeles a few months later. When she gave birth to Katherine, she brought Evelyn, her daughter from her first marriage, to Los Angeles. The mother reported the father treated the children fine until Anthony was born. The mother stated: "Jose began to come home angry after Anthony was born. He mistreated/insulted my older children. Evelyn and Carlos began to work because Jose complained that he was supporting another man's children."

The mother reported the father was sexually inappropriate with the maternal grandmother and Evelyn. (As noted, Evelyn was the mother's daughter from the first marriage.) In 2001, the father exposed his private parts to the maternal grandmother. He told the maternal grandmother he had a hernia near his groin and needed her to look and touch it. In 2006, the father became violent after Evelyn got a job and he vandalized the house. He threw and broke furniture and dishes and punched holes in the walls. Two or three days after the incident, the mother was lying in bed and the father thought she was asleep. Evelyn, who was 16 years old at the time, walked into the bedroom. The father lifted the blanket and exposed his naked body to her. The father denied exposing himself but the mother told him she saw what had happened. During the argument, the maternal grandmother had a panic attack and the ambulance was called. The police came and told the family to leave.

The mother returned several hours later with the children and saw the home was in shambles. The father came home while she was there and tried to hit the mother. Evelyn pulled the father's arm and said, "Don't hit her or I will call the police." The father pushed Evelyn out of the way. The mother stated: "He was yelling at Evelyn. He was telling her, 'You know you like what I do to you. You want me to do it to you.' Jose attacked my older son and Evelyn called the police." The police arrived. The mother told the police she wanted to leave. The mother asked for a police report but they declined to prepare one. The mother and children went to a friend's house that night and the next day drove to her sister's house. The mother tried to get a restraining order in Monterey. But the mother was advised by the judge the restraining order had to be

7

secured in Los Angeles County because the incident happened there. The father called the mother daily and threatened her so she returned to Los Angeles because she could not get a restraining order in Monterey.

When the mother and children returned home, the house was repaired and "things were good" for about three months. The mother said, "He began to insult me because I told him to do things to me and not the kids." After her return, the mother suspected the father was using drugs based on his behavior. The mother also reported she found Evelyn's undergarments in the father's bed. In addition, the mother stated she would follow the father at night when he left his bedroom to go look at Evelyn.

The mother reported Anthony began to developmentally regress in 2006. Anthony was five years old at the time, and she had already potty trained him. But he regressed and began soiling his pants. He stopped talking and used baby sounds. He also threw tantrums, throwing himself on the ground and hitting himself. As for Katherine, the mother said: "Katherine began to act out violently towards me and Anthony. We worked with the shelter and the therapist on this problem."

In 2008, the mother and children were living a few houses from the father at the paternal grandmother's house. The mother was caring for the paternal grandmother who was healing from a fall. The father was stressed because he had lost his business and had been unemployed for some time. The mother drove the children to the paternal grandmother's house and apparently passed the father who was walking home. The father arrived at the paternal grandmother's home and began yelling at the mother. He slapped the mother in her face in front of the paternal grandmother, Katherine and Evelyn. The father threw a cell phone at the mother and pushed the paternal grandmother.

In the 2009 child custody evaluation, Katherine reported witnessing the domestic violence between the parents at the paternal grandmother's home. Katherine stated: "I was there. I saw that he hit my mom. I saw that he pushed his own mom. My sister tried to catch her (to keep her from falling). I saw he was throwing stuff. Then he just left. He came back and started hitting the door to get inside. I heard the banging. They told

8

us to hide upstairs. He was throwing stuff in the kitchen at my mom. He threw my cell phone and his keys. It came really close. She was at the table standing. I was with my brother, but we were in the hallway."

A 2009 child custody evaluation detailed the prior domestic violence incidents, the father's sexually inappropriate behavior and his mental health issues. The father denied he had engaged in domestic violence. He stated: "Because of the discussion I had with my wife, she left and they have been living in shelters since then. I feel responsible." But he denied yelling or slapping the mother. The father also denied throwing and breaking the family's furnishings. In addition, the father denied he sexually molested Evelyn and the maternal grandmother. The father indicated he was going to see a psychologist soon because he heard "a lot" of voices. The father stated, "I hear (the mother's) voice, I hear my children, her family." He reported the voices went away when he went to church and touched his head with holy water. He reported his auditory hallucinations began in March 2009. The evaluator, Dr. Diana Devilliers, recommended the father be evaluated by a psychiatrist for his auditory hallucinations. In addition, Dr. Devilliers recommended the father receive weekly individual counseling for six months to address domestic violence, sexual misconduct, and his hallucinations.

Katherine told a department investigator: "I think my dad is crazy. Mentally, I just think he is weird. I figured it out (that father is crazy) a long time ago. When we lived with him, he would pass by our bedroom all night. He would say people are following him (and they were not). He would tell me to look up at the helicopters and he would make me take pictures of the helicopters. . . . I didn't want to take the pictures. I would laugh and tell him he is crazy." Katherine also indicated the father was paranoid. She stated: "My dad said a white man was following him. He told me, 'This white man wants to kill me.' He also thought my uncle (maternal uncle) is following him. My uncle lives in Japan." Katherine also reported the father had hallucinations. She stated, "He would tell me, 'I saw your uncle in the back (yard) staring at me.'"

Katherine had conjoint counseling with the father in the past but did not like it. She stated: "It felt like a waste of time. The therapist said I was not cooperative. The

therapist turned against me and was really mean to me. I was in a bad mood in the therapy. I told the therapist, 'I don't like my dad.' . . . I stayed quiet in the therapy and did my homework." Katherine believed therapy had not helped the father. She said: "I think he needs a lot of help. He is not going to change soon. It won't be overnight. I don't want to visit with him until he gets help. A lot of therapy. Specialized therapy."

Katherine also did not enjoy visits with the father. She said: "I never really liked visiting him. I don't really have any good memories with my dad. He always preferred my brother over me, so I never hung out with him. Sometimes he would be rude to me and other times he would give my brother money and not me. He spoiled my brother a lot and he would not give me anything." Katherine indicated: "My dad would tap Anthony on the head every second if he didn't like what Anthony was doing. I always sat in the back (back seat of car) and Anthony in the front (passenger seat). I would scream at my dad, 'Let him do whatever he wants.'" She also stated, "If Anthony had an accident (soiled pants) my dad would pretend Anthony didn't do anything. He would tell him to go change or something, but he was not mothering." Katherine indicated the father had tried to locate the family's residence and attempted to pick her and Anthony up from their respective schools despite the restraining order. Katherine stated: "I don't feel safe with my dad. I think they (Family Court) tried (to help father). He always gets another chance and he does the same thing over and over again."

Anthony was anxious and spoke only briefly with dependency investigator Judith Cohen. Anthony did not want to visit the father. Anthony felt "scared" when visiting the father. He did not want to discuss "his accidents" but reported he had not had one in about a week. Ms. Cohen met Anthony for a second time and he appeared more relaxed. However, Anthony refused to discuss the allegations.

Ms. Cohen and Ms. Hernandez, the social worker, contacted the father to schedule a meeting with him to discuss the allegations. But he refused to schedule a meeting with Ms. Cohen, stating he had "contacted the embassy" and the police. The father's speech was rapid and incoherent. He made references to an embassy, a police station and false allegations.

The department's recommendations were at the conclusion of the report authored by Ms. Cohen and another dependency investigator, Priscilla Ashburn. The department supported Dr. Devilliers's recommendations that the father participate in a 52-week domestic violence counseling program, submit to a psychiatric evaluation and participate in individual counseling. The department reported the father had not provided evidence of complying with the family law orders and there had been no demonstrated change in his behavior. The department concluded the father's unresolved issues caused Katherine and Anthony severe stress. And the department concluded the father's conduct caused Anthony's encopresis. The department recommended that visitation with the father commence once the father: underwent a psychiatric evaluation; began to follow the evaluator's recommendations; and demonstrated progress in ameliorating his mental health issues.

### D. Hearing On Jurisdiction, Disposition And Permanent Restraining Order

On December 5, 2012, the father failed to appear at the adjudication and permanent restraining order hearing. In addition, none of the attorneys in the matter had been contacted by any attorney for the father. The juvenile court noted the mother was a non-offending parent and proceeded with the trial. The department's detention and jurisdiction/disposition reports and the October 1, 2012 last-minute report were admitted into evidence. The court found the petition true as alleged and sustained the counts under section 300, subdivisions (b) and (c).

On disposition, the juvenile court removed the children from the father. The court ordered individual counseling and wraparound services for the children. In addition, Katherine was to be provided with a referral to a support group with the National Alliance for Mental Health. The department was ordered to provide the children with conjoint counseling with either parent if recommended by the youngsters' therapist.

The father was ordered to enroll in a 52-week domestic violence course and individual counseling to address case issues. Also, the father was: to have mental health

11

counseling and a psychiatric evaluation; to take all prescribed psychotropic medication; and not allowed visitation with the children until he underwent a psychiatric evaluation and followed the evaluator's recommendations. The juvenile court concluded: "[I]t would be detrimental to the children . . . to have visits with their father without the psychiatric evaluation and some track record of following the evaluator's recommendations. [¶] Thereafter, visits will be monitored, [department] approved monitor, [department] approved location. Mother is not to monitor."

After issuing the dispositional order, the juvenile court heard the mother's permanent restraining order request. The mother testified in 2012, the father had verbally assaulted her three or four times but he never physically threatened her or the children. She also testified the father yelled and threw things at her. The mother thought the father was dangerous and she and the children were afraid of him. She stated: "I don't think that he's mentally okay. He was always exposing his parts to other people. That's why I think he's a danger to the kids. [¶] On the other hand, he was also talking about things that aren't real. He was telling the children he was being pursued. And he was telling me the social worker and the attorneys are part of my family, and he was going to destroy everybody." After hearing testimony, the juvenile court issued a one-year permanent restraining order for the mother and children.

## III. DISCUSSION

The father argues the juvenile court erred by not allowing him visitation with the children until after a psychiatric evaluation and some showing of following the evaluator's recommendations. Section 362.1, subdivision (a) provides in relevant part: "(a) In order to maintain ties between the parent or guardian and any siblings and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent or guardian, or to encourage or suspend sibling interaction, any order placing a child in foster care, and ordering reunification services, shall provide as follows: [¶] (1)(A) Subject to subparagraph (B), for visitation between

12

the parent or guardian and the child.  Visitation shall be as frequent as possible, consistent with the well-being of the child.  [¶]  (B) No visitation order shall jeopardize the safety of the child. . . .  ”  The Court of Appeal has explained, “[T]he parents’ interest in the care, custody and companionship of their children is not to be maintained at the child’s expense; the child’s input and refusal and the possible adverse consequences if a visit is forced against the child’s will are factors to be considered in administering visitation.” (*In re S.H.* (2003) 111 Cal.App.4th 310, 317; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (*David P.*) (2006) 145 Cal.App.4th 692, 699.)  The juvenile court has the power to regulate visitation between a dependent child and the parents.  (*In re S.H.* (2011) 197 Cal.App.4th 1542, 1557; *In re Jennifer G.* (1990) 221 Cal.App.3d 752, 756.)  The juvenile court may not delegate decisions over whether visitation will occur to a dependent child, a therapist, or any third party.  (*In re Grace C.* (2010) 190 Cal.App.4th 1470, 1478; *In re S.H., supra,* 111 Cal.App.4th at p. 317-318; *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138-1139.)  We review a visitation order for abuse of discretion.  (*In re S.H., supra,* 197 Cal.App.4th at p. 1557; *In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.)

The juvenile court’s visitation order was not an abuse of discretion.  There is ample evidence to support the juvenile court’s determination that:  visitation is contrary to the children’s best interest unless the father first undergoes a psychiatric evaluation; visitation is inappropriate unless the father complies with the evaluator’s recommendations; and the father has schizophrenia, hallucinations, and paranoia and was sexually inappropriate with the maternal grandmother and the children’s half-sister, Evelyn.  There is evidence:  the father told Katherine that airplanes were taking pictures of him and people were following him; Katherine also reported the father had hallucinations; Anthony stated the father talked about helicopters landing on the roof of the home; during calls with Ms. Cohen and Ms. Hernandez, the father made incoherent statements, ranting “about the FBI, Facebook, law enforcement corruption, and a [department] lawsuit” and said someone was trying to kill him; the father told Dr. Devilliers he heard imaginary voices that went away when he went to church and

13

placed holy water on his head; the mother stated the father was not taking any medication for his schizophrenia; Dr. Devilliers recommended the father undergo a psychiatric evaluation; and the department reported there was no evidence the father had complied with the family court order.

In addition, the father behaved violently and perpetrated domestic violence against the mother. Katherine stated the father was verbally and physically abusive when he was angry. The father slammed doors, drove fast, screamed and spoke negatively about the mother when he was upset. In addition, he was verbally and emotionally abusive to the mother. On two occasions in 2006 and 2008, the father vandalized the family home by throwing furniture, breaking dishes and punching holes in the walls. In 2008, the father slapped the mother and threw items at her in front of the paternal grandmother, Evelyn and Katherine. Katherine told the child custody evaluator that she and her brother witnessed the 2008 domestic violence incident.

Finally, there is substantial evidence to support the finding that visitation with the father would be detrimental to the children's safety and well-being. Anthony has generalized anxiety disorder, post-traumatic stress disorder and encopresis because of the father's abusive behavior. The mother reported when Anthony was five years old, he was toilet-trained but regressed after witnessing domestic violence. The mother also reported Anthony threw tantrums and stopped talking, using baby sounds instead. Anthony's therapist, Beth Rosenblatt, from Venice Family Clinic in a September 2, 2009 letter, stated that Anthony "regresses very easily" to toddler-like behavior. Also, Ms. Rosenblatt related that Anthony had not yet developed the ability to verbalize his feelings. Katherine was diagnosed with dysthymic disorder and post-traumatic stress disorder. The mother said: "Katherine began to act out violently towards me and Anthony. We worked with the shelter and therapist on this problem."

Moreover, both children stated they were afraid of the father and did not want to visit him. Katherine indicated she was anxious when visiting with the father and felt relaxed now that she had not seen him. Katherine did not feel safe with the father and

14

believed he needed a lot of specialized therapy. Anthony was afraid during visits with the father.

The father acknowledges his "relationship with his children was less than perfect," but contends the juvenile court could have ordered therapeutic visits. But there is no evidence therapeutic visits would alleviate the children's severe emotional trauma. Katherine felt previous conjoint counseling with the father had been "a waste of time" because he needed specialized therapy and had not changed. In addition, the father's continued denial of the domestic violence and emotional abuse allegations shows he has not yet addressed his abusive behavior and mental health issues. The juvenile court acted within its discretion in denying the father visitation until after he had a psychiatric evaluation and showed compliance with the evaluator's recommendations.

Finally, there is no merit to the father's contention that the children are controlling whether visitation is to occur. The juvenile court never made an order which permitted the children to determine whether visitation was to occur. No doubt, it is possible a co-joint counseling order can give a child the upper hand in determining whether visitation is to occur. Potentially, a child could refuse to participate in co-joint counseling thereby leading the juvenile court to erroneously deny visitation. However, no such order was made in this case. Rather, the upshot of the juvenile court's visitation order is to require the father to undergo a professional evaluation, something he desperately needs, and then fashion an appropriate visitation order. The visitation order is not dependent upon the children's decision to participate in co-joint counseling.

## IV.  DISPOSITION

The juvenile court's December 5, 2012 visitation order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

TURNER, P. J.

We concur:

MOSK, J.

KRIEGLER, J.

16